IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION


RICKEY DALE NEWMAN                                    PETITIONER

v.                          CASE NO. 05-2107

LARRY NORRIS, Director,
Arkansas Department of Correction                    RESPONDENT


## ORDER

Evidentiary hearings were held on November 8 and November 27, 2007, on the issue of whether the habeas corpus statute of limitations should be equitably tolled due to Petitioner's mental incompetence at the time he waived his post-conviction appeal. Respondent contends that Petitioner's habeas petition is untimely and should not be considered. (*See* Doc. 20, Response to Petition for Writ of Habeas Corpus, at 9-12.) Petitioner contends that some days included in the statutory period by Respondent are statutorily tolled and that the entire time between the day the statute of limitations began to run up to the day the federal habeas petition was filed should be statutorily and/or equitably tolled. (*See* Doc. 48, Reply to Response to Motion for Evidentiary Hearing.)

**A. PROCEDURAL HISTORY**

Petitioner was charged with Capital murder in the Circuit Court of Crawford County, Arkansas for the violent murder of Marie Cholette. After a capital murder trial that lasted one day, June 10, 2002,

AO72A
(Rev. 8/82)

Petitioner was convicted and sentenced to death.[1]   Petitioner represented himself throughout the guilt and penalty phases of the trial, although stand-by counsel was appointed.

Following the verdict, Petitioner attempted to waive his direct appeal, but this was denied by the Arkansas Supreme Court.  Petitioner then attempted to have the mandatory direct appeal dismissed while it was pending and this was denied on January 30, 2003 (Counsel was appointed and a 7-page brief filed).  On May 22, 2003, the Arkansas Supreme Court affirmed the verdict and death sentence.

On July 30, 2003, Petitioner requested to waive the appointment of post-conviction counsel and to abandon all post-conviction remedies.  He further requested that an execution date be set as soon as possible.  Crawford County Circuit Court found that Petitioner had entered a valid waiver of his rights to counsel and to seek post-conviction relief.  However, the Arkansas Supreme Court reversed the order as it appeared that Petitioner could have been on psychotropic medication during the time he requested the waivers.  The case was remanded to the circuit court and a mental health evaluation was

---

[1] Other than a video tape taken by a surveillance camera at a liquor store in Fort Smith, Arkansas, that showed Petitioner with the victim several days before the murder, the only evidence against him were his own statements.  There was little to no evidence at the crime scene and no evidence derived from the DNA analysis of the scene that connected Petitioner to the crime.  Many of the important details revealed by Petitioner of the crime were contradicted by findings and conclusions of the investigators.  Petitioner was found guilty by a jury that had to operate on facts related to them by Petitioner.  Whether Petitioner actually committed the crime is not the issue, for the sole issue before this Court is the lapse of time for Petitioner to file for relief in this Court.

2

ordered.

After receiving a report from Dr. Charles Mallory, a psychologist with the Arkansas State Hospital, the Crawford County Circuit Court accepted Petitioner's waivers once again and found him competent to waive his rights.  On April 15, 2004, the Arkansas Supreme Court affirmed the competency finding.

On September 20, 2004, federal public defenders filed a motion in Crawford County Circuit Court requesting forensic DNA testing.  On February 3, 2005, the Crawford County Circuit Court held an Inquiry Hearing as to legal representation of Petitioner and concluded that the federal public defenders, Mr. Bruce Eddy and Ms. Julie Brain, had not been appointed to represent Petitioner.  Therefore, the court terminated Mr. Eddy and Ms. Brain from further representation of Petitioner and dismissed all pending motions (specifically the request for DNA testing) filed in that court on behalf of Petitioner.  The federal public defenders then filed a reconsideration motion regarding the request for forensic DNA testing and a request to proceed through Next-Friend Betty Moore.  These were denied on May 2, 2005.

In the Arkansas Supreme Court, on September 21, 2004, the federal public defenders filed a Motion to Recall the Mandate and For a Stay of Execution.  The Arkansas Supreme Court issued a stay and a briefing schedule to assist with the decision to recall the mandate. Petitioner then requested that the Arkansas Supreme Court vacate its briefing schedule to allow him to proceed with his post-conviction

3

appeal in Crawford County Circuit Court.  The Arkansas Supreme Court granted the request to vacate the briefing schedule on December 9, 2004.  On June 2, 2005, the Arkansas Supreme Court granted a *pro se* motion to dissolve Petitioner's stay of execution.  On September 8, 2005, the Arkansas Supreme Court declared the Motion to Recall the Mandate to be moot in a one-line letter order.

**B. DISCUSSION**

28 U.S.C. § 2244(d) reflects that a state prisoner must file his or her habeas corpus petition within one year after the completion of the state court proceedings.

(1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court.  The limitation period shall run from the latest of –

(A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking review;. . . or

(2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

*Id.*

Petitioner is in custody pursuant to the judgment of an Arkansas Court and contends that his several state filings (Request to Waive Rights to Post-Conviction Relief and to Counsel, Motion for DNA Testing and resulting Motion for Reconsideration, Motion to Recall the Mandate, and Motion For a Stay of Execution) constitute "properly filed application[s] for State post-conviction or other collateral

4

review...."  *See* 28 U.S.C. § 2244(d)(1)(B).

    1.  <u>Statutory Tolling of the Statute of Limitations</u>.

    On July 30, 2003, Petitioner requested to waive his rights to pursue post-conviction relief and to counsel.  Following the requests, there were several state court proceedings, to include the remand for mental health evaluation, the mental health evaluation and the second hearing to address Petitioner's requests.  Petitioner's requests to waive representation of counsel and for further review were properly filed applications submitted according to Arkansas' procedural requirements.  A petitioner would not begin preparation of his only federal habeas petition until it is known if the state reviews are concluded.  In our case, Petitioner's state review process continued until the state courts accepted his requests to waive further review and to proceed without counsel.  Therefore, the time Petitioner was awaiting decision on his waiver requests, the statute of limitation should be statutorily tolled.  The time (238 days) between the date the judgment became final, August 20, 2003, and the ruling on Petitioner's waiver of counsel and post-conviction review, April 15, 2004, is statutorily tolled.

    The other time periods Petitioner contends should be statutorily tolled involve motions that were not properly filed applications for state post-conviction or other collateral review, and must be counted as days the statute of limitations continued to run.  Petitioner contends the Motion for Forensic DNA Testing in Crawford County

Circuit Court and the Motion to Recall the Mandate in the Arkansas Supreme Court were properly filed applications and the time between those filings and the rulings on them should be statutorily tolled. (*See* Doc. 48, Reply to Response to Motion for Evidentiary Hearing, at 11-14.)  Petitioner specifically contends that the Motion to Recall the Mandate was properly filed as the motion was permitted by state law, was accepted by the court and assigned the same case number as the State's Petition.  He further supported his contention by stating the state court granted a stay of execution and ordered a briefing schedule on the motion.  (Doc. 48 at 12, Reply to Response to Motion for Evidentiary Hearing (citing *Nara v. Frank*, 264 F.3d 310, 316 (3rd Cir. 2001) (finding that petitioner's motion to withdraw guilty plea *nunc pro tunc* tolled AEDPA's limitations period because, inter alia, the state court accepted it, allowed parties to brief issues and make full consideration of record before denying it.)))  The state court determined the federal public defenders who presented the motion for forensic DNA testing were not properly before the court, nor were they recognized as being parties or representatives of parties before the court.[2]  The motion to recall was declared moot by the Arkansas Supreme Court.

---

[2]The Crawford County Circuit Court dismissed the Act 1780 petition, seeking forensic DNA testing and the Rule 37.5 petition seeking to have the mandate recalled, finding that Petitioner did not want to pursue these matters and that he was proceeding *pro se.*  Specifically, the state court found that the federal public defenders did not represent Petitioner in state court. (Doc. 20 at 6 (citing the transcript of the post-conviction proceedings in *Arkansas v. Newman*, Crawford Country Circuit Court No CR2001-109, Arkansas Supreme Court No. CR05-701 at 345-46.))

Petitioner's reliance on *Nara* is not warranted, as the facts in the current case are not similar to the facts in *Nara*. In *Nara*, the Third Circuit Court of Appeals found that the motion in question tolled the statute of limitations as a properly filed application for relief because the state court accepted the motion, allowed the issues to be briefed, and made a full consideration of the record before denying the motion. However, in the case *sub judice*, although the Motions to Recall and for Forensic DNA Testing were accepted by the state courts and issues were allowed to be briefed, the motions were not considered on their merits before the state courts ruled upon them (one was dismissed as it was filed by a person not properly before the court, while the other was dismissed as moot). We agree that the federal public defenders were not proper persons to file applications on behalf of Petitioner before the state court. Consequently, the motions were not properly filed. Therefore, the time between the filing of these motions and the filing of the federal petition for habeas relief is not statutorily tolled.

2.   Equitable Tolling of the Statute of Limitations.

Federal courts have recognized that mental incompetence can lead to equitable tolling of the statute of limitations. *See e.g., Nara*, 264 F.3d 310. However, "the alleged mental incompetence must somehow have affected the petitioner's ability to file a timely habeas petition." *Id.* at 320. The Eighth Circuit Court of Appeals has stated that "mental impairment can be an extraordinary circumstance

7

interrupting the limitation period...." *Nichols v. Dormire*, 11 Fed. Appx. 633, 634 (8th Cir. 2001) (holding that mental impairment can warrant equitable tolling. However, Nichols' impairment did not interfere with the running of the statute of limitations). "Equitable tolling is proper only when extraordinary circumstances beyond a prisoner's control make it impossible to file a petition on time." *Id.* at 633 (quoting *Kreutzer v. Bowersox,* 231 R.3d 460, 463 (8th Cir. 2000) (additional citation omitted)).

The test for competency is "whether [petitioner] has capacity to appreciate his position and make a rational choice with respect to continuing or abandoning further litigation or on the other hand whether he is suffering from a mental disease, disorder, or defect which may substantially affect his capacity in the premises." *Smith v. Armontrout*, 812 F.2d 1050, 1056 (8th Cir. 1987)(quoting *Rees v. Peyton*, 384 U.S. 312, 314 (1966)).

Petitioner was found competent by the Arkansas courts on more than one occasion.  In February 2002, Petitioner was examined by the state to determine his fitness to stand trial and to determine his criminal responsibility at the time of the alleged conduct.  Dr. Charles Mallory, a forensic psychologist employed by the Department of Human Services, Arkansas State Hospital, examined Petitioner pursuant to the state court's order.  (Hr'g Tr. Vol. 2 at 59, 61.) After examining Petitioner for three hours over the course of seven days, Dr. Mallory found Petitioner fit to proceed and to be without

8

mental disease or mental defect.[3]   (Hr'g Tr. Vol. 2 at 84, 61.)
During the examination, Dr. Mallory conducted various tests, to
include the MacArthur Competency Assessment Tool, Wechsler Abbreviated
Scale of Intelligence test, the Folstein Mini-mental State Exam, and
the Kent test.  (Hr'g Tr. Vol. 2 at 63, 68, 69.)

During the hearing in this Court on November 27, 2007, Dr.
Mallory was cross-examined regarding the tests administered.
Specifically, Dr. Mallory was questioned regarding the Wechsler
Abbreviated Scale of Intelligence (Abbreviated Scale) test.  He agreed
that the manual for this test specifically states that the test is not
to be used as a diagnostic tool, nor is it appropriate to use for
legal/forensic needs, but rather the test is to be used as a screening
tool for large groups of people, such as schools and the military.[4]
(Hr'g Tr. Vol. 2 at 88-90; Respondent's Ex. 28.)  Dr. Mallory stated
the Abbreviated Scale test has a higher error rate and that the full
range IQ test is more reliable.  (Hr'g Tr. Vol. 2 at 66-7, 126.)  He
also testified that if a person scored below a certain level on the
Abbreviated Scale test, he would then administer the full scale IQ
test.  In response to a question by the Court, Dr. Mallory said that
he "would want to do a full evaluation" if a person scored in the "low

---

[3]During the 2002 examination, Dr. Mallory diagnosed Petitioner with
polysubstance dependence and anti-social personality disorder, stating that
neither diagnosis equated to a mental disease or defect.  (Hr'g Tr. Vol. 2 at
61-2.)

[4]Dr. Mallory testified that he used the Abbreviated Scale test to
save time.  (Hr'g Tr. Vol. 2 at 64.)

AO72A
(Rev. 8/82)

to mid seventies" on the verbal portion of the short form IQ test. (Hr'g Tr. Vol. 2 at 79.)

It was determined during the hearing, that Dr. Mallory miscalculated the raw scores of Petitioner's Abbreviated Scale test (the error was in miscalculating Petitioner's age as 46 versus Petitioner's actual age of 44, which then caused the incorrect scale to be used to determine the score). (Hr'g Tr. Vol. 2 at 93.) Petitioner was found to have an IQ score of 84 in verbal instead of the corrected score of 80, and a full IQ score of 78 instead of the stated correct score of 75. (Hr'g Tr. Vol. 2 at 95.) Although Dr. Mallory's response of a score of "low to mid seventies" was to the Court's question regarding what *verbal* IQ score would trigger the need for a full evaluation, it appears that Dr. Mallory would also view a low to mid seventies *full scale* score as necessitating further investigation of Petitioner's cognitive function.[5] (Hr'g Tr. Vol. 2 at 79, 95). This is important as Petitioner's corrected IQ score was 75 but no further investigation of Petitioner's cognitive function occurred; *i.e.*, the administration of a full-scale IQ test.

Additionally, the evidence showed Dr. Mallory administered the Folstein Mini-mental State Exam (Folstein). During cross-examination,

---

[5]After Dr. Mallory realized during the hearing that he had incorrectly scored Petitioner's Abbreviated Scale test, Petitioner's counsel asked him "Seventy-five would be right at mid to low seventies, is that right?" Which Dr. Mallory responded, "That's right." Counsel then asked "Right at the point where you said that even you would want to do a much further investigation of Mr. Newman's cognitive function?" Dr. Mallory responded "You're right. I certainly made a big error." (Hr'g Tr. Vol. 2 at 95.)

10

Dr. Mallory admitted he substituted his own scoring for some of the answers (*i.e.*, awarding Petitioner a point for the date, although he answered 27th or 28th when it was the 25th, awarding a point for the county when he had guessed two incorrect counties prior to giving the correct answer) and alterations to some of the questions (*i.e.*, subtracting 3 from 20 in a serial fashion instead of subtracting 7 from 100 in a serial fashion because Petitioner had difficulty correctly subtracting 7 from 100 in a serial fashion). (Hr'g Tr. Vol. 2 at 97-8, 99-100, 101)  The manual for the Folstein exam does not permit substitute questions or flexibility in scoring.[6]  (Hr'g Tr. Vol. 2 at 98, 100, 101; Respondent's Ex. 31.)  Dr. Mallory testified that the manual was published after he began using the Folstein exam and that he was trained to take into account a person's actual situation, such as incarceration, when scoring the exam.  (Hr'g Tr. Vol. 2 at 102.)  Dr. Mallory admitted that he should not have awarded Petitioner a point for the sentence task as the sentence written by Petitioner was not comprehensible.  (Hr'g Tr. Vol. 2 at 104.)  Dr. Mallory also admitted he erred in awarding Petitioner a point for the diagram he drew, as Petitioner's diagram was virtually identical to the test manual's example of an incorrect diagram.  (Hr'g Tr. Vol. 2 at 106.)  In addition to awarding points that should not have been given, Dr. Mallory also miscalculated the points awarded Petitioner,

---

[6]Although Dr. Mallory admitted that the Folstein Mini-mental State Exam's manual did not permit flexibility in scoring or in questioning, he stated that the manual came along after he began using the test.  (Hr'g Tr. Vol. 2 at 102.)

11

recording that Petitioner scored 29 points instead of the 24 points Dr. Mallory actually awarded.  (Hr'g, Tr. Vol. 2 at 96.)   Without improper flexibility and substitution, it appears Petitioner actually scored an 18 out of 30.  (Hr'g Tr. Vol. 2 at 106.)  The Folstein exam manual places the score of 26 as the cutoff for cognitive impairment.[7] (Hr'g Tr. Vol. 2 at 107, Respondent's Ex. 31.)   Therefore, Dr. Mallory's scoring of 29 out of 30 is not an accurate measure of Petitioner's mental ability at the time of examination.

Dr. Mallory also administered the Kent test, a test that has neither been published, nor shown to have any kind of reliability or validity.  (Hr'g Tr. Vol. 2 at 86-7.)  Dr. Mallory gave Petitioner a score of 30 out of 36 on the this test, which Dr. Mallory interpreted as "a pretty good score that would tell you that he's not likely to come out in the range of mental retardation."  (Hr'g Tr. Vol. 2 at 69.)  Dr. Mallory also administered the MacArthur Competency Tool, which resulted in Petitioner scoring in the impaired range.  (Hr'g Tr. Vol. 2 at 107-8.)

Dr. Mallory testified in the hearing on November 27, 2007, that he evaluated Petitioner again in January 2004 to determine whether Petitioner was competent to waive his right to counsel and his right to post-conviction appeals.  Dr. Mallory examined Petitioner at the

---

[7]Dr. Mallory testified that he uses a score of 23 to 24 as the cutoff for cognitive impairment when testing people without much grade school without much grade school education.  He went on to state "nonetheless, an 18 is significantly below normal.  Now, this is no surprise.  He does have significantly below normal intelligence level."  (Hrg. Tr. at 106-7.)

12

prison where he was housed for one hour.  (Hr'g Tr. Vol. 2 at 111-12.)
He re-administered the Folstein Mini-mental State Exam and the Kent
Test.  (Hr'g Tr. Vol. 2 at 112.)  Dr. Mallory did not re-administer
an IQ test, but relied on the IQ score Petitioner received on the
Abbreviated Scale test administered in February 2002.  (Hr'g Tr. Vol.
2 at 76.)  Dr. Mallory again concluded Petitioner was competent to
waive his rights. (Respondent's Ex. 3 at 8.)

Dr. Mallory testified that during the second evaluation in 2004,
Petitioner stated he wanted to be executed.  Dr. Mallory stated that
Petitioner, "during the evaluation, was using [Dr. Mallory] as a tool
in an attempt to bring about his own death...."  (Hr'g Tr. Vol. 2 at
113-14.)  Dr. Mallory testified "If the fact of the matter was that
Mr. Newman had a very realistic possibility of securing release from
prison as the result of an appeal, and he was aware that he had that
realistic possibility, and nevertheless decided I want to be executed
anyway, his competency to make that decision would be in serious
doubt...."  (Hr'g Tr. Vol. 2 at 115.)  Dr. Mallory also testified that
"[i]t would be irrational" if Petitioner was innocent of the crime and
chose to be executed.  (Hr'g Tr. Vol. 2 at 115-16.)

In addition to the tests administered and the scoring of those
tests, Dr. Mallory was cross-examined on the social history he
obtained regarding Petitioner.  On direct examination, Dr. Mallory
testified that he had no evidence that Petitioner had difficulty
holding a job, specifically citing Petitioner's Marine Corps

AO72A
(Rev. 8/82)

experience and that he held a position in California for approximately six months.  (Hr'g Tr. Vol. 2 at 116-17.)  Dr. Mallory admitted that Dr. Stewart had "considerably more information about Mr. Newman's history and functioning than was provided to [him] at the time of [his] evaluations either in 2002 or in 2004."  (Hr'g Tr. Vol. 2 at 80.)  Although Petitioner told Dr. Mallory that death means peace, Dr. Mallory testified that he did not inquire as to whether Petitioner had a history of suicidal ideations and did not recall asking Petitioner about suicidal feelings when Petitioner was feeling suicidal during the 2004 evaluation.  (Hr'g Tr. at Vol. 2 118-19.)

Petitioner's competency hearing in February 2004 before the Circuit Court of Crawford County, Arkansas, consisted of Dr. Mallory's report and testimony that Petitioner was fit to proceed in his requests to waive further appeals and his right to counsel.  (*See* Hr'g Tr. Vol. 2 at 125 (there is no indication that any other evidence was considered by the state court.))  Dr. Mallory's reliance on the previous examination of Petitioner that was based in part upon incorrectly scored tests was accepted without question.  There was no cross-examination of Dr. Mallory, nor was there any presentation of evidence or argument that Petitioner was incompetent.  At no time did the hearing become adversarial in nature.

During the hearings of November 8 and November 27, 2007, Petitioner presented testimony by two experts: Dr. Ricardo Weinstein, a psychologist specializing in neuropsychology, and Dr. Pablo Stewart,

14

a psychiatrist.  Dr. Weinstein evaluated Petitioner for approximately eight to ten hours over two days (Hr'g Tr. Vol. 1 at 10) and administered ten neuropsychological tests (Petitioner's Ex. 6 at 1). One test administered was the full range IQ test, the Wechsler Adult Intelligence Scale-III, where Petitioner scored a verbal IQ of 70, performance IQ of 69, and a full scale IQ of 67.[8]  (Hr'g Tr. Vol. 1 at 13.)  After reviewing Petitioner's performance on all of the tests, along with declarations of persons with information regarding Petitioner and Petitioner's social history, Dr. Weinstein concluded to a reasonable degree of psychological certainty that Petitioner suffered from significantly impaired intellectual functioning as he was more than two standard deviations below the mean, and that Petitioner suffered from significantly impaired frontal lobe functioning.  (Respondent's Ex. 6 at 11.)  Dr. Weinstein testified that Petitioner was unable to make rational decisions at the time he waived his state appeals and was not competent during that same time period.  (Hr'g Tr. Vol. 1 at 27.)  Dr. Weinstein found that:

> [t]he neuropsychological battery administered to [Petitioner] over two days demonstrates significant and consistent deficits that are manifested in his inability to plan and organize behaviors in a goal directed manner and to understand social interactions and act accordingly. [Petitioner] exhibits poor judgment, lack of impulse

---

[8]Dr. Mallory considers an IQ score of 69 or lower to be indicative of mental retardation.  (Hr'g Tr. Vol. 2 at 75.) Dr. Mallory agreed that Dr. Weinstein and Dr. Stewart conducted "extremely thorough and competent evaluations of Mr. Newman."  *Id.* at 80.  Dr. Mallory also stated "I think the issue of his intellectual functioning is a valid one in that the WASI is a more reliable measure, and Dr. Weinstein did obtain a score in the range of mental retardation...."  *Id.* at 126.

AO72A
(Rev. 8/82)

control, his abstract reasoning abilities are very limited and he acts without true understanding of the potential consequences of his actions.

(Petitioner's Ex. 6 at 11.)

Dr. Pablo Stewart examined Petitioner for approximately six hours over three days. (Hr'g Tr. Vol. 2 at 20.). He outlined the abuse and neglect that Petitioner suffered as a child. (Hr'g Tr. Vol. 2 at 23-25.) Dr. Stewart diagnosed Petitioner with post traumatic stress disorder, chronic type, with resultant major depressive disorder; polysubstance dependence; and significant cognitive impairments with prominent difficulties in his frontal lobe which have resulted in difficulty with executive functioning. (Hr'g Tr. Vol. 2 at 20.) Dr. Stewart's opinion was that Petitioner's "decisions to waive his appeals and seek his own execution was a direct result of his mental illnesses, the suicidal impulses and impaired thinking that are [] symptoms of his illnesses." (Petitioner's Ex. 5 at 42.) Dr. Stewart noted that Petitioner had severe cognitive impairments, which made him "extremely less likely to address these symptoms." (Petitioner's Ex. 5 at 42.) Dr. Stewart found that Petitioner:

> had the capacity . . . to appreciate his position, i.e. that he was incarcerated under a sentence of death and would be executed if he waived his appeals. As a result of his mental illness, however he did not have the capacity to make a rational choice to abandon further litigation. Rather, his decisions were driven by his traumatic history, depression and his overwhelming impulse to end his life.

(Petitioner's Ex. 5 at 42.)

16

Dr. Stewart testified that although Petitioner is not taking steps to dismiss his federal petition, he desires to be executed, and has "only allow[ed] Ms. Brain [federal public defender] to proceed with his case out of respect for her." (Petitioner's Ex. 5 at 42-43 ; Hr'g Tr. Vol. 2 at 44.) Dr. Stewart's opinion was that Petitioner's "desire to die [was] the irrational product of a severely mentally ill mind...." (Petitioner's Ex. 5 at 43.) Dr. Stewart also gave the opinion to a reasonable degree of professional certainty that Petitioner suffered from the before described deficits, was incompetent when making the decision to waive his State post-conviction review rights, and the waiver decision was an involuntary product of his mental condition. (Hr'g Tr. Vol. 2 at 42-44; Petitioner's Ex. 5 at 43-44.)

A state's factual determination of competency following a hearing "evidenced by a ... reliable and adequate written indicia" generally is entitled to a presumption of correctness by the federal habeas court. *O'Rourke v. Endell*, 153 F.3d 560, 567 (8th Cir. 1998) (quoting 28 U.S.C. § 2254(d))). In *O'Rourke*, a competency hearing was held to determine if the petitioner was competent to waive his right to appeal his state conviction. The state court appointed an attorney to represent the petitioner, but ordered the attorney to take the position that the petitioner was competent. 153 F.3d at 565. The state doctor testified that the petitioner was competent. *Id.* at 566. Cross-examination did not challenge the doctor's opinion, but rather

17

appeared to bolster the doctor's opinion. *Id.* The court questioned petitioner, with petitioner clearly stating he wished to be executed, to abandon his appeal and to proceed without representation. *Id.* at 568. The state court found the petitioner competent. *Id.* The Eighth Circuit Court of Appeals found that the state court's questioning of the petitioner failed to "'demonstrate that [O'Rourke] appreciated the consequences of [his] decision' to waive his Rule 37 appeal." *Id.* at 568 (alterations in original)(quoting *Whitmore v. Arkansas*, 495 U.S. 149, 165 ((1990)). The Eighth Circuit Court of Appeals found that the hearing was not full and fair and failed to afford petitioner the process he was due. *O'Rourke.* At 569.

In the case *sub judice*, Petitioner's competency hearing held on February 25, 2004 in the Crawford County Circuit Court cannot be said under the circumstances to have been full and fair, nor did it comport with due process. *See id.* To an even greater extent than in *O'Rourke*, the record as a whole demonstrates that Petitioner's waiver of counsel and waiver of his post-conviction appeal were not knowing and voluntary. The finding of Petitioner's competency was premised on improperly administered and scored psychological tests, with no checks and balances in place, such as an adversarial process. The record reflects no basis for a reliable finding that Petitioner was mentally competent to waive his rights to counsel and the post-conviction appeal.

18

The position that Petitioner was not competent to waive his rights to counsel and to seek post-conviction relief should have been advanced by an attorney, either a counsel of record or a "next friend."  The court's failure to appoint such a representative resulted in an evidentiary hearing that failed to adequately develop all material facts and failed to afford Petitioner the process he was due, resulting in a hearing that was neither full nor fair.  Although an adversarial competency proceeding is not mandatory, it would have afforded an opportunity for the court to discover discrepancies in the evidence presented to support a finding of competence.[9]  In a case such as this, where there are problems in the one and only examining doctor's administration and scoring of psychological examinations that go undisclosed during the state appellate process, the need for an adversarial process escalates.  This is especially true in a death penalty case, where there are no advocates for the position that Petitioner is incompetent.  Therefore, the state court's finding of competence is not entitled to a presumption of correctness.

Although, on the bases of the record before us and the difficulty in looking back to a specific time over three years ago, we cannot say with complete certainty that Petitioner was in fact incompetent at the times in question, we find that the circumstances of the 2004

---

[9]If an adversarial competency hearing had been conducted at state court, Dr. Mallory's calculations would have been challenged and errors revealed.  Very likely the errors would have been corrected and Petitioner would have received a full and fair competency hearing.  No criticism of Dr. Mallory is intended.  He is a well trained and competent psychologist who made scoring mistakes that he readily admitted.

19

competency hearing resulted in a hearing that was neither full nor fair. The evidence before this Court shows sufficient indicia that Petitioner was not competent at the time he waived his state post-conviction appeals and his right to counsel to warrant equitable tolling of the habeas statute of limitations. Furthermore, the evidence shows that Petitioner's probable incompetence continued to interfere with his pursuit of habeas relief after the 2004 competency hearing and continued for a large part, if not all of the time following his hearing up to the present time. The evidence shows that Petitioner continues to focus on his desire to end his life, regardless of any possibility of having his conviction overturned on review, although he has allowed his attorneys to proceed with his habeas petition based upon his relationship with one of his attorneys.

Additionally, a motion is currently pending regarding the admissibility of several declarations presented by Petitioner during the evidentiary hearing. During the first day of the hearing, Petitioner offered a declaration, Petitioner's Exhibit 4 for identification, which was used by the experts in formulating their opinions. Respondent objected to the declaration on the basis of authentication. The Court conditionally admitted the declaration and instructed Petitioner to have the declaration authenticated. Petitioner instead filed a lengthy memorandum of points and authorities (Doc. 76) requesting that the declaration be admitted without authentication, as it is admissible under 28 U.S.C. § 1746

20

AO72A
(Rev. 8/82)

(signed documents dated and under penalty of perjury are treated as verified and satisfy affidavit requirements in federal proceedings) and Fed. R. Evid. 703 (which allows an expert to "rely on otherwise inadmissible hearsay evidence in forming his opinion if the facts and data upon which he relies are a type reasonably relied upon by experts in his field.")  During the second day of the hearing, Petitioner offered several additional declarations similar to Petitioner's Exhibit 4 for identification.  These additional declarations were marked Petitioner's Exhibits 7-19 for identification.  Respondent again objected on the basis of authentication.  The Court conditionally admitted the declarations and invited Respondent to respond to Petitioner's motion.  Respondent filed a Response (Doc. 77) contending the declarations are hearsay and Fed. R. Evid. 703 does not permit the admittance of inadmissible hearsay merely because an expert relied upon the inadmissible hearsay.  Although Petitioner presented adequate support for the experts' permissible use of the declarations to form their opinions, he failed to present adequate support for the admission of the actual declarations.  Therefore, we find Petitioner's Exhibits 4 and 7-19 are inadmissible hearsay evidence.  We have not considered these declarations during the course of our review of the issues currently before this Court.

**B.   CONCLUSION**

     We find that the time between August 20, 2003 and April 15, 2004 to be statutorily tolled.  We further find that the time between the

21

date the statute of limitations began to run, whether that date is August 20, 2003 (if the time between August 20, 2003 and April 15, 2004 is found not to have been statutorily excludable) or April 15, 2004, and the filing of the Petition for habeas relief on December 30, 2005 to be equitably tolled.  Petitioner was not afforded a full and fair hearing regarding his mental competency, and in all likelihood he was mentally incompetent for a large part, if not all, of the time preceding the filing of his Petition for habeas relief.  Petitioner's mental impairment is an extraordinary circumstance that has interrupted the limitation period, and therefore we find Petitioner's federal habeas petition (Doc. 13) is timely.

The evidence received on the issue of timeliness of Petitioner's federal habeas petition will be considered during the review of the merits of the Petition (Doc. 13).  Parties have thirty (30) days from the date of this order to present additional matters to be considered in the Court's review of Petitioner's federal habeas petition.  Responses must be filed within fifteen (15) days of the filing of additional matters.

IT IS SO ORDERED this 24th day of January 2008.

/S/ Robert T. Dawson
Robert T. Dawson
United States District Judge

22